

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TITO BROWN,

          Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

21-CV-2641 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

    Plaintiff Tito Brown filed this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (the Act), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying his application for Supplemental Security Income (SSI). Now before me are the parties' cross-motions for judgment on the pleadings. For the reasons that follow, plaintiff's motion (Dkt. 16) will be granted and the Commissioner's motion (Dkt. 22) will be denied.

## Background

    Plaintiff, now aged 46, has a ninth-grade education and a long history of serious mental illness. He was variously diagnosed with schizophrenia and bipolar disorder, beginning at least as early as 2008, *see* Certified Administrative Record (Dkts. 7-9) at 363, 366 (hereinafter "R. __"); was psychiatrically hospitalized at least three times from 2005 to 2011, due to paranoia and auditory and visual hallucinations (R. 363, 366-446, 461, 502, 591); and lived for a period of time in "mental health housing" with onsite psychiatric services. (R. 591.) He also has long-standing diagnoses of hypertension, type II diabetes, and asthma, and an umbilical hernia resulting from a gunshot wound. (R. 330-65, 366-446, 464-73, 532.)

From June 2014 through June 2019, plaintiff was incarcerated.[1] During that period, he participated in intensive mental health treatment through the prison's Community Orientation and Re-entry Program (CORP), including 20 hours per week of group therapy and monthly individual therapy and medication management. (R. 460-61, 501-05.) One of his treating providers at CORP, Dora Gutierrez, Psy.D., assisted plaintiff in applying for SSI in anticipation of his release from prison.[2] In connection with those efforts, Dr. Gutierrez prepared a Comprehensive Mental Health Report dated April 2, 2019 (R. 506-10), and wrote a letter, dated May 3, 2019, describing plaintiff's mental health history, treatment, and prognosis. (R. 460-63.)

In her letter, Dr. Gutierrez explained that CORP was a "highly structured and supervised milieu," within which plaintiff had been "medication and treatment compliant." (R. 462.) Although he was committed to staying in therapy after his release to "manage his psychosis," Dr. Gutierrez advised that once in the community, with less structure and support, "he may decompensate and become psychiatrically unstable," which in the past had led to him becoming "self-destructive, violent, impulsive and consequently substance abusing." (*Id.*) Should that occur, Dr. Gutierrez

---

[1] The website maintained by the New York Department of Corrections and Community Supervision reports that he was imprisoned from June 3, 2014 to June 20, 2019. *See* "Incarcerated Lookup," N.Y. State Dep't of Corr. & Comm. Supervision, *available at* https://nysdoccslookup.doccs.ny.gov/ (last visited September 28, 2022.)

[2] The record is somewhat confusing concerning the date of and the asserted bases for plaintiff's SSI application. His handwritten application form is dated March 28, 2019, and states that he became unable to work on April 1, 2008, due to schizophrenia. (R. 225-34.) However, the "Application Summary for Supplemental Security Income" prepared by the Social Security Administration (SSA) on July 22, 2019, states that plaintiff applied for SSI on May 23, 2019, alleging disability since January 1, 2017. (R. 235.) Plaintiff's "Disability Report – Adult," which appears to have been completed on plaintiff's behalf by Dr. Gutierrez, lists his disabling conditions as paranoia, auditory hallucinations, visual hallucinations, anxiety, hypertension, asthma, and diabetes. (R. 254.) The SSA's "Disability Determination Explanation" forms, dated September 23 and December 3, 2019, agree that plaintiff sought benefits due to paranoia, auditory hallucinations, visual hallucinations, anxiety, hypertension, asthma, and diabetes, but state that the application was filed on May 22, 2019. (R. 125-26, 141.)

opined, plaintiff "will most likely become a danger to himself and/or others and need further intensive psychiatric care including hospitalization." (*Id.*) She concluded that given the amount of support plaintiff would require to "maintain a functional level," including "case management services, mental health housing, substance abuse treatment program, medication management, and a day treatment [program]," his treatment team did not believe that plaintiff would be able to "maintain steady gainful employment once released to the community." (R. 462-63.)

### Post-Application Medical Evidence

Upon his release from prison, plaintiff was placed in a homeless shelter for individuals with mental health problems (R. 591-92) and enrolled in the EAC ("Empower, Assist, Care") forensic intensive case management program. (R. 500, 514-25.) He also participated in an intensive mental health and substance abuse treatment program at RevCore, and took aripiprazole (Abilify) to control his hallucinations and other psychotic symptoms. (R. 483-97, 526-27). Additionally, he established medical care at Janian Medical Care (Janian), where he saw various nurse practitioners and was prescribed insulin and Metformin for his diabetes and Lisinopril for his hypertension. (R. 577-93, 620-56.)

In connection with his SSI application, plaintiff underwent consultative examinations by internist Silvia Aguiar, M.D. (R. 529-32) and psychologist Joseph Coleman, Ph.D. (R. 535-40). Dr. Aguiar's physical examination of plaintiff took place on August 28, 2019, and was unremarkable, except for the umbilical hernia and a surgical scar. (R. 530-31.) Dr. Aguiar noted that plaintiff's last asthma attack had been more than three years ago. (R. 529.) She opined that he should avoid respiratory irritants and "any activities that increase intraabdominal pressure" (R. 532), but assessed no other limitations.

Dr. Coleman examined plaintiff on September 17, 2019. He questioned plaintiff about his mental health history and treatment, and performed a mental status examination, which revealed that plaintiff's affect was flat, his attention and concentration were impaired "due to limited intellectual functioning," his memory was similarly impaired, his cognitive functioning was below average, and his insight and judgment were only fair. (R. 537-38.) The exam was otherwise unremarkable. (*Id.*) Dr. Coleman wrote that plaintiff had no difficulties performing activities of daily living (ADLs) such as dressing, bathing, cooking, and shopping, but had a "mild" limitation in understanding, remembering, and applying simple directions and instructions and a "moderate" limitation in understanding, remembering, and applying complex directions and instructions, using reason and judgment to make work related decisions, interacting adequately with supervisors, co-workers and the public, sustaining concentration and performing a task at pace, sustaining an ordinary routine and regular attendance at work, regulating emotions, controlling behavior, and maintaining well-being. (R. 538-39.)

On October 16, 2019, while at Janian for a medical appointment, plaintiff reported "burning chest pain." (R. 620.) After an abnormal EKG, he was transported to Montefiore Hospital, where an inferior wall STEMI (ST-elevation myocardial infarction) was diagnosed. (R. 561.)[3] Plaintiff underwent an emergency LHC (left heart catheterization), during which two stents were placed in the compromised coronary arteries. (*Id.*) He was discharged from the hospital on October 21, 2019, with prescriptions for Lipitor (a cholesterol-lowering medication), Toprol (a Beta-blocker), and Brilinta (an anti-platelet medication). (R. 570-71.)

---

[3] A STEMI is a type of heart attack that is more serious and has a greater risk of serious complications and death." "STEMI Heart Attack," Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/22068-stemi-heart-attack (last visited Sept. 28, 2022).

Thereafter, plaintiff returned to Janian, where he was seen regularly through April 2020. (R. 623-56.) At most of these visits plaintiff reported feeling well, with no chest pain, palpitations, or shortness of breath. (R. 623, 626, 630, 642, 650.) He reported that he used his albuterol inhaler "about once a week." (R. 642, 650.) During his December 20, 2019 visit with psychiatric nurse practitioner Alexandra Back, plaintiff discussed "how to best support his SSI case." (R. 635.) His Abilify dose was increased and NP Back added an antidepressant, escitalopram (Lexapro), an anticholinergic, benztropine mesylate (Cogentin), and an antihistamine, diphenhydramine hydrochloride (Benadryl). (R. 637.) On December 27, 2019, NP Beck performed a psychiatric evaluation. Plaintiff's mental status exam was generally normal, though his mood was depressed and his range was constricted. (R. 639-40.) NP Back assessed that he presented "no acute risk of danger to self or others," but was "chronically" "at risk" due to "numerous medical, psychiatric, substance-related comorbidities, & homelessness." (R. 640.) She noted that plaintiff was "responding to pharmacotherapy and psychotherapy," and asserted that he would "greatly benefit from placement into permanent supportive housing for individuals with mental illness who are high functioning." (*Id.*) Notwithstanding plaintiff's high functioning, NP Back opined that he would not be able to maintain gainful employment due to his "[f]requent deficiencies of concentration persistence or pace," "[m]arked restrictions of activities of daily living" (specifically listing "maintaining a residence, using transportation, day to day money management, accessing community services"), and "[m]arked difficulties in maintaining social functioning." (*Id.*) She added that since his alcohol use disorder had been in remission since 2015, "the difficulties in functioning are due to the designated mental illness." (R. 640-41.)

On April 27, 2020, NP Beck filled out a Medical Source Statement about plaintiff, opining that he had "mild" to "extreme" limitations in understanding, remembering, and carrying out

instructions and "moderate" to "marked" limitations in interacting appropriately with supervisors, co-workers, and the public (R. 607-08), all due to his cognitive impairments, "poor stress tolerance," and "low stress threshold," which caused "dysfunction in social, vocational, educational, [and] occupational settings." (R. 608.)

Notwithstanding his October 2019 heart attack, plaintiff was not re-assessed physically in connection with his SSI application.

## Administrative Proceedings

Plaintiff's application was denied initially on September 23, 2019 (R. 140), and upon reconsideration on December 3, 2019. (R. 162.) Plaintiff requested a hearing before an ALJ (R. 180), which was held by telephone (due to the COVID-19 pandemic) before ALJ Mark Solomon on May 27, 2020. (R. 90-124.) Vocational expert (VE) Francesca Fazzaroli also testified. (R. 90).

At the hearing, plaintiff told the ALJ that since his heart attack he had "[c]hest pains and shortness of breath so that I'll hyperventilate," particularly "when I walk a lot or when I'm climbing stairs." (R. 98-99.) Additionally, he reported that his left hand was "really weak" and that he had to walk with a cane since the heart attack. (R. 101-02.) Plaintiff is right-handed. (R. 111.) He testified that he "can't really lift nothing heavy anymore," partly because of his heart and his weak left hand, and partly "because that hernia might bust open." (R. 105.) Plaintiff testified that he was taking Abilify and an antidepressant for his mental illness and that, because of these medications, he sometimes "can't focus or I lose focus or get sidetracked." (R. 103.) He confirmed that he was still able to do laundry and shopping, that he got along with the other residents at the shelter, and that he regularly visited his adult children, using public transportation. (R.100, 102-03.) His hobby was drawing. (R. 109.) Under questioning from his own lawyer, plaintiff added that his shortness

of breath was also due to his asthma, for which he took albuterol "at least twice or three times a day" (R. 107), and that his difficulties with his left hand extended to the fingers, which would "get locked around the cane," such that he would have to "bend them back open." (R. 112.)

### **The ALJ's Decision**

In a written decision dated July 6, 2020 (Decision), ALJ Solomon concluded that plaintiff was not disabled within the meaning of the Act. (R. 47-58.)

At step one of the five-step analysis mandated by 20 C.F.R. § 416.920, the ALJ found that plaintiff had not engaged in substantial gainful activity since his application date. (R. 50.)

At step two, the ALJ found that plaintiff's schizophrenia, asthma, diabetes mellitus, recurrent hernia, and myocardial infraction were severe impairments. (R. 50.)

At step three, the ALJ found that none of plaintiff's impairments met or medically equaled the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. 50-53.) With respect to plaintiff's mental impairments, the ALJ found that they did not satisfy the "paragraph B" criteria of Listing 12.03 ("schizophrenia spectrum and other psychotic disorders") because they did not cause at least two "marked" or one "extreme" limitation in the four broad areas of functioning set forth therein. (R. 52.)[4] The ALJ found that plaintiff had "mild" limitations in understanding, remembering, or applying information and adapting or managing himself, and "moderate" limitations in interacting with others and in concentrating, persisting or maintain pace. (R. 51-52.) As for the "paragraph C" criteria," the ALJ found, with minimal discussion, that they

---

[4] *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.03(B). The four areas of mental functioning are: (1) the ability to "[u]nderstand, remember, or apply information; (2) the ability to "[i]nteract with others"; (3) the ability to "[c]oncentrate, persist, or maintain pace"; and (4) the ability to "[a]dapt or manage oneself." *Id.* § 12.00(E). Each area is assessed "based on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation. To satisfy the paragraph B criteria, [a claimant's] mental disorder must result in extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning." *Id.* § 12.00(F)(2).

were not satisfied because "the record fails to document the existence of this criteria [sic] and the claimant is able to function outside the area of his home." (R. 52.)[5]

The ALJ then found that plaintiff had the residual functional capacity (RFC) to perform light work, as defined in 20 C.F.R. § 416.967(b),[6] except that he can "sit up to six hours, and stand and walk a total of six hours. He can occasionally climb, balance, stoop, kneel, crouch, and crawl," and must "avoid working at unprotected heights or with hazardous machinery" and "concentrated exposure to respiratory irritants." He can "remember, understand, and carry out simple instructions, and make simple work-related decisions," and can "interact appropriately with supervisors and coworkers" and have "occasional interpersonal contact with the public." However, he must "not perform a job requiring high volume or fast paced assembly line production quotas." (R. 53.)

In formulating plaintiff's RFC, the ALJ found that his statements about the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent" with other evidence in the record (R. 54), pointing out, for example, that at recent treatment appointments plaintiff

---

[5] To satisfy the "paragraph C" criteria, the claimant must show that his mental disorder "is 'serious and persistent;' that is, [that he has] a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [his] mental disorder; and (2) [m]arginal adjustment, that is, [he has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.03(c) (internal cross-references omitted).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 416.967(a).

"advised that his chest pain and other complications from his heart attack had improved," and was still able to do his ADLs "independently." (*Id.*) The ALJ added that to the extent the heart attack affected plaintiff's functionality, "the residual functional capacity identified above has taken those residual [e]ffects into consideration." (*Id.*) Similarly, the ALJ reasoned that plaintiff's treatment notes undercut his claims of functional limitations due to his hernia (which had never required any treatment), his asthma (for which he was never hospitalized), or his diabetes (frequently described by his physicians as "without complication" and "well controlled" with medication). (R. 54-55.) As for plaintiff's mental impairments, the ALJ noted that he got along well with other shelter residents and at recent appointments had denied any current hallucinations or disorientation. (R. 55.) Thus, the ALJ wrote, although his mental impairments affected his "interpersonal skills and his concentration," they "do not entirely prevent him from being able to function." (*Id.*)

Turning to the opinion evidence, the ALJ found Dr. Coleman's psychiatric consultative opinion "only partially persuasive," because plaintiff could perform his ADLs independently and "treatment records do not document severe cognitive or concentration limits due to any intellectual functioning difficulties." (R. 56.)[7]

The ALJ found NP Back's opinion "wholly unpersuasive" because plaintiff could perform his ADLs independently and his treatment records "consistently show him with minimal limitations." (R. 56.) Further, the ALJ wrote, NP Back's opinion that plaintiff had poor stress tolerance was "speculative and unpersuasive as he adjusted well both to incarceration and being in a shelter, both situations which are inherently stressful." (*Id.*)

---

[7] It is not entirely clear from the Decision what portion of Dr. Coleman's decision the ALJ found unpersuasive. Both Dr. Coleman and ALJ Solomon found that plaintiff had a "mild" limitation in understanding, remembering, or applying information. (R. 51, 538.)

9

The ALJ found Dr. Aguiar's physical assessment "only partially persuasive" because Dr. Aguiar "did not provide a work functioning analysis related to any of [plaintiff's] impairments" and "her findings were overbroad, without any functional limits." (R. 56.)[8]

Two non-examining state agency consultants assessed plaintiffs physical RFC: B. Patel, M.D. at the initial level, and S. Putcha, M.D. at the reconsideration level. (R. 131, 154-56.) The ALJ found both of them "persuasive," even though they came to radically different conclusions – both of which were inconsistent with the ALJ's ultimate RFC formulation. (R. 56-57.) Dr. Patel opined on September 5, 2019 that plaintiff had no severe physical impairments at all, and consequently no exertional limitations. (R. 131.) Dr. Putcha opined on December 3, 2019 that because of plaintiff's severe heart disease he was limited to sedentary work with additional postural limitations. (R. 154-56.) The ALJ explained that this was persuasive because, "at the time of the assessment," plaintiff's "cardiac condition would have impacted his ability to perform certain exertional and physical tasks." (R. 57) In the ALJ's view, however, by the time of the Decision plaintiff had the "capacity to perform work duties at the light exertional level." (*Id.*)

As for the two non-examining state agency consultants who assessed plaintiff's mental RFC (M. Juriga, Ph.D. at the initial level and E. Kamin, Ph.D. at the reconsideration level (R. 134-36, 156-59)): they largely agreed with one another, but the ALJ found them only "partially persuasive." (R. 56-57.) Both Dr. Juriga and Dr. Kamin concluded that plaintiff had "moderate" difficulties in all areas of mental functioning, although he retained the capacity "to meet the basic mental demands of competitive, . . . unskilled work." (R. 134-36, 156-59.) In the ALJ's view, both

---

[8] The ALJ appears to have been mistaken on this point. Dr. Aguiar opined that plaintiff should avoid respiratory irritants and "activities that increase intraabdominal pressure." (R. 532.) The ALJ did not discuss whether Dr. Aguiar's opinion had become less persuasive, or required updating, after plaintiff's heart attack.

consultants overestimated plaintiff's functional mental limitations because "the evidence fails to establish difficulties with his memory or ability to manage his personal affairs without heightened stress." (R. 56.)

The ALJ did not mention the opinion of prison psychologist Dr. Gutierrez.

At step four, the ALJ determined that plaintiff had no past relevant work. (R. 57.)

Finally, at step five, ALJ Solomon found – based in part on the hearing testimony of VE Fazzaroli – that jobs exist in significant numbers in the national economy that plaintiff could perform, including assembler, sorter, and polisher. (R. 57-58). The ALJ concluded that plaintiff had not been disabled "since September 22, 2019 [sic], the date the application was filed." (R. 58).[9]

Plaintiff's request for review was denied by the Appeals Council on January 27, 2021 (R. 1-7), rendering the ALJ's determination final.[10] This action followed.

## The Parties' Positions

Insofar as the Court can follow plaintiff's unfocused and disorganized brief, he argues, in substance, that the ALJ erred by fashioning an RFC that did not fully credit plaintiff's testimony or the medical opinions most favorable to plaintiff's claim of disability, by failing to consider his

---

[9] This date is clearly incorrect. *See* n.2, *supra*. Nonetheless, both parties repeat it in their briefs, reciting that plaintiff filed his SSI application on September 22, 2019. *See* Pl. Mem. (Dkt. 17) at ECF page 5; Def. Mem. (Dkt. 23) at 1.

[10] Plaintiff submitted additional medical evidence to the Appeals Council, including Montefiore Hospital records from November 15, 2019 through June 10, 2020. (R. 67-89.) At a cardiac follow-up visit with Robert Forman, M.D., on January 30, 2020, plaintiff reported that he felt "good," with no chest pain, and could walk 10-20 blocks and up the subway stairs, but was "[s]hort of breath at time[s]." (R. 72.) Dr. Forman prescribed "regular exercise," and told plaintiff "he must be walking daily which he . . . agreed to do." (R. 75.) The Appeals Council did not exhibit these records because, in its view, the new evidence did not "show a reasonable probability that it would change the outcome of the decision." (R. 2.) Plaintiff also submitted Janian treating notes reflecting an October 8, 2020 visit with psychiatrist Katherine Jenkins, M.D. (R. 12-15), and Montefiore Hospital records from August 13 to December 16, 2020 (R. 16-40). The Appeals Council did not exhibit these records because they post-dated the ALJ's Decision. (R. 2.)

"persistent efforts to obtain relief from pain and other symptoms," and by failing to discuss the "possible side effects" of his medications. Pl. Mem. at ECF pages 13-23. The Commissioner argues that the ALJ's decision is supported by substantial evidence and free of legal error. Def. Mem. at 17-25.

After a careful review of the record, the Court has determined that this case must be remanded for three reasons – none of them briefed by plaintiff. *First*, the ALJ erred in failing even to consider the opinions of Dr. Gutierrez, who treated plaintiff in prison. *Second*, the ALJ failed to consider whether plaintiff's reliance on time-intensive mental health programming to maintain his psychiatric stability would interfere with his ability to perform full-time employment. *Third*, after accepting the finding of Dr. Putcha, in December 2019, that plaintiff was limited to sedentary work because of his heart attack, the ALJ erred when he concluded – without support from any new or updated medical opinion – that by July 2020, plaintiff could perform light work.

## **Standards**

In considering the parties' motions, I have reviewed the administrative record and applied the familiar standards used by federal district courts to review decisions of the Commissioner. Generally speaking, a court may "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). This is so because "[e]ven if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

12

A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the error harmless. *Garcia v. Berryhill*, 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. *Dubois v. Comm'r of Soc. Sec.*, 2022 WL 845751, at *4 (S.D.N.Y. Mar. 21, 2022). Thus, if the ALJ's determinations are supported by substantial evidence, "the Court must affirm the decision of the [Commissioner] even if there is also substantial evidence for plaintiff's position." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1417 n.2 (S.D.N.Y. 1995) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

Where, as here, the claim for benefits was initiated after March 27, 2017, the ALJ need not defer or "give any specific evidentiary weight, including controlling weight," to any medical opinion or prior administrative medical finding. 20 C.F.R. § 416.920c(a). Rather, the ALJ must evaluate the "persuasiveness" of each opinion or finding in light of: (i) its "[s]upportability"; (ii) its "[c]onsistency"; (iii) the "[r]elationship" between the medical source and the claimant; (iv) the source's "[s]pecialization" in a relevant medical field; and (v) "other factors that tend to support or contradict" the opinion or finding. 20 C.F.R. § 416.920c(c)(1)-(5). Of these, the most important factors are "supportability" and "consistency." *Id.* § 416.920c(b)(2); *Rivera v. Comm'r of the Soc. Sec. Admin.*, 2020 WL 8167136, at *11 (S.D.N.Y. Dec. 30, 2020), *report and recommendation*

*adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021). An ALJ commits procedural error if he fails to evaluate a medical source's opinions for persuasiveness, *see Lisa B. v. Comm'r of Soc. Sec.*, 2022 WL 1473277, at *7 (N.D.N.Y. May 10, 2022), or if, when performing that evaluation, he fails to discuss the supportability and consistency factors. *See Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (summary order) (ALJ "committed procedural error" by failing to explain how the supportability and consistency factors were considered).

## The ALJ Failed to Consider Dr. Gutierrez's Opinions

Here, the ALJ erred by failing to consider – or even mention – the medical opinions of Dr. Gutierrez, who was one of plaintiff's treating providers in prison and provided a detailed report, as well as a separate letter, setting out his mental health history, his response to incarceration, his course of treatment while in prison, and his prognosis. (R. 460-63, 506-10.) Dr. Gutierrez wrote that plaintiff did well in CORP because it was a "highly structured and supervised milieu," but that once he was in the community, with less structure and support, "he may decompensate and become psychiatrically unstable," which in the past had led to him becoming "self-destructive, violent, impulsive and consequently substance abusing." (R. 462.) Dr. Gutierrez based her opinion on plaintiff's "history of these symptoms," which "tend to become exacerbated under stressful conditions." (*Id.*) In Dr. Gutierrez's view, plaintiff would need "a lot of support to ensure stability in the community" and "maintain a functional level," including case management services, a substance abuse program, medication management, and "a day treatment [program]." (R. 462-63.)

The ALJ was not, of course, required to accept Dr. Gutierrez's conclusion that, because of these factors, plaintiff would be unable to "maintain steady gainful employment once released to the community." (R. 463.) *See* 20 C.F.R. § 416.920b(c) (opinions on "issues reserved to the Commissioner," such as whether a claimant is "able to work," are "inherently neither valuable nor

persuasive"); *Schillo v. Kijakazi*, 31 F.4th 64, 70 (2d Cir. 2022) ("The ultimate finding of whether the claimant is disabled is reserved to the agency[.]"). But he was required to *consider* the remainder of Dr. Gutierrez's report and letter, including her insights concerning plaintiff's past episodes of decompensation, and *evaluate* her views in accordance with 20 C.F.R. § 416.920c(b), which requires the ALJ to consider and evaluate "all of the medical opinions" in the record. His failure to do so was legal error. *See Rua-Campusano v. Kijakazi*, 2022 WL 493390, at *2 (S.D.N.Y. Feb. 17, 2022) ("Pursuant to federal regulations, ALJs are required to consider all medical opinions in the record and evaluate their persuasiveness based on supportability and consistency."); *Lisa B.*, 2022 WL 1473277, at *7 (ALJ's failure to "reference, cite, or discuss Dr. Iosilevich's 2018 opinion" constituted "legal error").[11]

Moreover, the error was not harmless, because ALJ Solomon wholly ignored both the April 2, 2019 Comprehensive Mental Health Report and the April 3, 2019 letter, and because Dr. Gutierrez's opinions concern plaintiff's "ability to handle stress," which is the same topic as to which the ALJ rejected NP Back's opinion as "speculative and unpersuasive." (R. 56.) *See generally Matos v. Berryhill*, 2017 WL 2371395, at *18-19 (S.D.N.Y. May 5, 2017) (remand was required where ALJ failed to seek opinion evidence from prison psychiatrists who treated plaintiff during her recent incarceration), *report and recommendation adopted sub nom. Matos v. Comm'r of Soc. Sec.*, 2017 WL 2364368 (S.D.N.Y. May 30, 2017). In this case, the ALJ had the necessary opinions before him but failed to mention them, much less evaluate them as required by § 416.920c.

---

[11] In *Lisa B*, the ALJ considered one of the two medical opinions submitted by Dr. Iosilevich, but failed to separately consider the second one. 2022 WL 1473277, at *7. The court ultimately held that the error was harmless, because "the opinions are similar enough that even if the ALJ explicitly discussed the 2018 opinion, his decision would likely not have changed." *Id.*

Where, as here, the medical opinion evidence in the record was not properly analyzed, and the error was not harmless, the court cannot conclude that the ALJ's RFC formulation was supported by substantial evidence. *See, e.g.*, *Danielle B. v. Comm'r of Soc. Sec.*, 2020 WL 1933603, at *8 (N.D.N.Y. Apr. 22, 2020) (because "the Court is not convinced the ALJ properly considered the opinion evidence," "the Court finds the ALJ's analysis of Plaintiff's RFC and the medical opinions is [sic] not supported by substantial evidence and thus remand is required"); *Marrero Santana v. Comm'r of Soc. Sec.*, 2019 WL 2330265, at *13 (S.D.N.Y. Jan. 17, 2019) ("Because the ALJ violated the treating physician rule," which at that time governed the evaluation of expert medical opinions, "his RFC determination – that plaintiff is capable of the full range of sedentary work – was not supported by substantial evidence."), *report and recommendation adopted sub nom. Santana v. Comm'r of Soc. Sec.*, 2019 WL 2326214 (S.D.N.Y. May 30, 2019). Remand is therefore required so that the ALJ can consider Dr. Gutierrez's report and letter.

### The ALJ Failed to Consider Plaintiff's Treatment Needs

When plaintiff was in prison he was enrolled in an intensive program that included 20 hours of therapy per week. (R. 461, 503.) According to Dr. Gutierrez, he would also require significant ongoing treatment to "maintain a functional level" in the community. (R. 462-63.) After his release, plaintiff did in fact receive a high level of support and treatment, including a forensic intensive case management program (R. 500, 516-25) and a mental health and substance abuse treatment program at RevCore. The Revcore program required plaintiff to attend group counseling five days per week and individual counseling once per week. (R. 523, 542, 552.) Dr. Coleman, the consultative psychiatric examiner, recommended that plaintiff continue with his treatment, "as currently provided," for another two years. (R. 539.) Dr. Coleman also found that plaintiff's "compliance" with his treatment program was key to his "fair" prognosis. (*Id.*)

However, there is no indication in the Decision that ALJ Solomon considered the "effects of treatment" on plaintiff's ability to maintain full-time employment, as required by SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996) (ALJ must take into account any "limitations or restrictions imposed by the mechanics of treatment," including "frequency of treatment, duration, [and] disruption to routine"). To the contrary: the ALJ relied in part on what he characterized (inaccurately) as the plaintiff's "rudimentary treatment" to find that he was not disabled. (R. 55.)

This too was error. "Where an ALJ fails to make findings concerning the limitations caused by the claimant's need for treatment, remand may be required." *Renee S. v. Comm'r of Soc. Sec.*, 2022 WL 2841916, at *5 (W.D.N.Y. July 21, 2022) (remanding because "the ALJ's written decision does not include any discussion or findings concerning what limitations, if any, Plaintiff's rigorous treatment regimen poses to her ability to meet the time-off-task and attendance requirements of the unskilled work the ALJ found she could perform consistent with her RFC"); *see also Scott G. v. Comm'r of Soc. Sec.*, 2021 WL 958452, at *4 (W.D.N.Y. Mar. 15, 2021) (remanding where "it appears likely that Plaintiff's treatment schedule could interfere with the ability to work, which needed to be considered in the ALJ's analysis"); *Searles v. Comm'r of Soc. Sec.*, 2019 WL 6337890, at *6-7 (D.N.J. Nov. 27, 2019) (remanding where the ALJ failed to discuss "Plaintiff's continuous treatment at Crossroads," which was relevant to his RFC because he was "in therapy at least three days a week for at least sixteen hours every week"); *Bellinger v. Comm'r of Soc. Sec.*, 2018 WL 6716092, at *2-3 (D. Conn. Dec. 21, 2018) (remanding because in formulating plaintiff's RFC the ALJ "focused only on her symptoms" and did not discuss whether her treatment, which included "weekly intravenous infusions lasting 2-3 hours," would render her unemployable); *Quinto v. Berryhill*, 2017 WL 6017931, at *9 (D. Conn. Dec. 1, 2017) (remanding where "the ALJ erred by failing to consider the evidence in the record that Quinto needed to use a

17

nebulizer every four to five hours," which according to the VE would be incompatible with competitive employment).

In this case, as in *Renee S.*, there was evidence before the ALJ that plaintiff's treatment regimen would be incompatible with full-time work. At the hearing, VE Fazzaroli testified that absenteeism of "even one or two days per month on a consecutive monthly basis will not be tolerated by employers." (R. 119.) However, the ALJ failed to consider that evidence when formulating plaintiff's RFC. Consequently, "remand is required for proper evaluation of the record evidence," *Renee S.*, 2022 WL 2841916, at *5, including the evidence concerning the limitations caused by plaintiff's need for intensive treatment. *Id.*

### The ALJ Improperly Relied on His Own Lay Opinion in Determining Plaintiff's Exertional Capacity

On December 3, 2019, approximately six weeks after plaintiff's STEMI heart attack and emergency LHC, Dr. Putcha reassessed his physical functioning and opined that as a result of "[c]ardiac ischemia and stenting," plaintiff was limited to sedentary work with additional postural limitations. (R. 154-56.) Dr. Putcha specifically found that plaintiff could stand and/or walk for a total of only 2 hours out of an 8-hour work day and could lift and/or carry no more than 10 pounds. (R. 154.) He did not characterize these limitations as temporary or otherwise indicate that plaintiff's exertional capacity would rebound in the near future. The ALJ found Dr. Putcha's opinion "persuasive," without qualification. Nonetheless, the ALJ determined that plaintiff had the physical RFC to stand and/or walk up to 6 hours in an 8-hour day and could perform light work, meaning that he could lift and/or carry up to 20 pounds. (R. 53.) The ALJ did not point to any updated medical opinion for this conclusion – there is none. Nor did he point to any specific medical evidence showing improvements in plaintiff's exertional capacity after Dr. Putcha's assessment. Rather, he reasoned that although plaintiff's "cardiac condition would have impacted

his ability to perform certain exertional and physical tasks" at the time of Dr. Putcha's review, plaintiff's ability to "engage in activities of daily living" by the time of the hearing supported an RFC for light work. (R. 57.)

This was error. "[I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Balsamo*, 142 F.3d at 81 (internal quotation marks omitted); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (an "ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion"); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) ("[A]n ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error."). "Put another way, 'ALJs may not, of course "play doctor" by using their own lay opinions to fill evidentiary gaps in the record.'" *Russ v. Comm'r of Soc. Sec.*, 582 F. Supp. 3d 151, 164 (S.D.N.Y. Jan. 31, 2022) (quoting *Manzella v. Comm'r of Soc. Sec.*, 2021 WL 5910648, at *14 (S.D.N.Y. Oct. 27, 2021), *report and recommendation adopted*, 2021 WL 5493186 (S.D.N.Y. Nov. 22, 2021)). Yet that is precisely what the ALJ did here, when he relied on his own lay judgment – in the absence of any updated medical assessment – to conclude that a post-STEMI cardiac patient who was limited to sedentary work in December could perform light work by the following July. *See also Rosario v. Kijakazi*, 2022 WL 875925, at *15 (S.D.N.Y. Mar. 15, 2022) (ALJ erred in using his lay judgment to characterize medical events post-dating the last relevant opinion in the record as "an isolated acute exacerbation"), *report and recommendation adopted,* 2022 WL 976879 (S.D.N.Y. Mar. 31, 2022).

If the ALJ believed that Dr. Putcha's December 3, 2019 opinion had become stale, or wished to consider whether plaintiff regained exertional capacity as he continued to recover from

his heart attack, he could and should have obtained an updated medical opinion. But he was neither equipped nor entitled to reject a "persuasive" administrative medical finding based on his own judgment as to the course of plaintiff's cardiac recovery thereafter. *See Jackson v. Comm'r of Soc. Sec.*, 2020 WL 486379, at *3-5 (W.D.N.Y. Jan. 30, 2020) (remanding for calculation of benefits where consultative examiner who saw claimant shortly after his heart attack opined that he should avoid "any exertional activity," but ALJ determined that he could perform sedentary work).

## Conclusion

For the foregoing reasons, plaintiff's motion (Dkt. No. 16) is GRANTED, the Commissioner's cross-motion (Dkt. No. 22) is DENIED, and this matter is REMANDED to the Commissioner for further proceedings consistent with this Opinion and Order.

The Clerk of Court is respectfully directed to close the case.

Dated: New York, New York        **SO ORDERED**.
       September 28, 2022

_____
**BARBARA MOSES**
**United States Magistrate Judge**